Filed 7/30/26  In re J.F. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | B349035 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  F.F.,  Defendant and Appellant. | Los Angeles County Super. Ct. No. 24CCJP01821B |

APPEAL from an order of the Superior Court of Los Angeles County, George A. Turner, Jr., Judge.  Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, Eden Gharapet, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Father appeals from the juvenile court's juvenile custody order awarding sole legal and physical custody of J.F. to mother. He contends the juvenile court did not apply the best interests of the child standard; and substantial evidence did not support finding granting mother sole legal custody was in J.F.'s best interests. We find no abuse of discretion and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and mother, who are not married, are the parents of J.F. (born April 2014). They lived with mother's daughter A.G. (born December 2010) in an apartment also shared with maternal aunt and uncle. Father's appeal concerns only J.F.

### 1. *Sustained petition and events leading up to it*

On August 14, 2024, the juvenile court sustained—as amended by interlineation—a petition the Los Angeles County Department of Children and Family Services (DCFS) filed on behalf of J.F. (and his older half sister A.G.) under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b)(1). The sustained a-1 and b-1 counts alleged: father "has physically abused mother" in J.F.'s home and in J.F.'s and A.G.'s presence; on May 24, 2024, father was arrested for intimate partner battery after—in the children's presence—he threw a coffee mug at mother, pulled her hair, and pushed her to the ground, and A.G. intervened "by pulling father's shirt from behind"; on May 5, 2024, father kicked mother's back;[2] in 2021, father tried to choke

---

[1]     Statutory references are to the Welfare and Institutions Code unless stated otherwise.

[2]     The record is ambiguous as to when the incident involving father kicking mother in the back occurred. It is recounted in the jurisdiction report as having taken place in May 2014, along with

mother, "causing [A.G.] to intervene by pulling . . . father away from . . . mother"; and "on prior occasions," father struck mother with his fists and slapped and pushed her in the children's presence.  The sustained b-2 count alleged that, during the May 24 incident, father also "grabbed and pulled" maternal aunt's hair, and pulled her out of the house, "causing [J.F.] to intervene."  The sustained b-3 count alleged father "is a recent and current abuser of alcohol, which renders . . . father incapable of providing regular care of [J.F.]," and during the May 24 incident, "and on prior occasions," father was "under the influence of alcohol in the children's home and in [their] presence, and while [J.F.] was in . . . father's care and supervision."[3]

According to the police report, on May 24, 2024, police were called to J.F.'s home for domestic battery.  On the way, they took father—who was walking away from the home—into custody.  The officers "observed that [father] was drunk."  Police interviewed mother.  She said she and father argued when she returned to the home that evening.  Father threw a mug in front of her on the floor then grabbed her by the hair and pushed her on the floor.  Mother yelled for someone to call the police.  Mother said she wasn't injured but feared father.  She told police "there [had] been numerous prior incidents of [d]omestic [v]iolence that were never reported."  Maternal aunt told police she had been in

_____

father's detention for battery.  Elsewhere, that same report states that the incident occurred in May 2024.

[3]     The court dismissed the a-2 count based on the same allegations as the b-2 count.  DCFS dismissed the petition's failure to protect allegations against mother after reaching a settlement with her.  Mother submitted to the jurisdiction of the court.

the bedroom when she heard mother and father arguing. She heard the mug break, stepped out of the room, and saw father holding mother by the hair. As maternal aunt tried to call 911, father grabbed her hair, pulled her outside of the apartment, and threw her cell phone on the floor, breaking it. J.F. and A.G. told police father "is drunk every day, and normally drinks beer and tequila." They said they'd seen domestic violence between mother and father at least 10 times. The children confirmed mother's statements. They said both mother and maternal aunt "fled the house," and father chased after them. After father smashed maternal aunt's phone, J.F. called the police. The police report noted that, at the station, father said, " 'I didn't do anything[.] I never hit her.' " He admitted he was drinking but said "he never put his hands on" mother.

Father has a criminal history. He was stopped for DUI three times: he was arrested in February 2024 and August 2021; and in May 2016, he was detained and released for lack of sufficient evidence. He also was detained and released for lack of sufficient evidence for intimate partner battery in May 2014 and sentenced to 36 months' probation for "[h]it and [r]un property damage" in February 2016. Mother also had called police to the family home in July 2020. Father had returned to the shared home drunk, and banged on the door until he got in. Mother and the children were in mother's bedroom when he entered, and father removed J.F. from the bedroom and took him into the living room. Mother "grabbed" J.F. from father and took him and A.G. outside to call the police. Father wasn't arrested, as police advised that he had not committed a crime. The officer advised mother to get a restraining order, but she declined. She said they were not together; father just lived in the same home and slept in

4

the living room. The officer "recommend[ed] alcohol rehabilitation and parenting classes for . . . father."

On May 29, 2024, the court issued a temporary restraining order protecting mother, J.F., and A.G. from father. The order allowed father to have contact with his children "only during court-ordered contact or visits" and contact with mother only to communicate about the children for court-ordered visits. The court allowed father to have unmonitored overnight visitation with J.F. from Friday afternoon to Sunday morning beginning on May 31. The order granted sole legal and physical custody of J.F. to mother. The order was set to expire at the end of a hearing scheduled for June 24, 2024.[4] On June 3, mother went to court to try to "drop all charges on father since [J.F.] wanted to see father." The court told her she'd have to make that request at the June 24 hearing. Mother trusted J.F. in father's care. She told the social worker she did not think there was any need for monitored visits.

DCFS interviewed father on June 5 about the May 24 incident, and he again denied "any past or present intimate partner violence." Father confirmed he had pending DUI charges but denied having any substance use issues. He did not understand why he had been pulled over for DUI in the past, stating, "unfortunately it was his turn to get pulled over." Father would not agree to drug or alcohol testing unless ordered by the court.

On June 7, 2024, the court granted DCFS's request for an order to remove J.F. from father, which DCFS served the same day. J.F. was released to mother. At the initial June 26 hearing,

---

[4]     As DCFS notes, the record does not state whether the restraining order was extended at that hearing.

the court detained J.F. from father and ordered J.F. remain released to mother under DCFS's supervision. The court ordered monitored visits for father at a minimum of nine hours per week.

During the dependency investigator's (DI) investigation, both children confirmed the petition's allegations. A.G. told the DI that, on May 24, she could tell father "was drunk by the way he was acting." She said, " 'He always starts fights when he is drunk.' " A.G. said father wasn't able to walk straight and had slurred speech. She said she had "witnessed [father] slap, punch, grab, and kick" mother in the past. A.G. couldn't describe a specific incident for the DI, but said, " 'He usually hits my mom when he is drunk and he is drunk a lot.' " During the incident, when A.G. grabbed father's shirt "to get him to stop going after" mother, father pushed A.G. away. J.F. saw A.G. try to stop the fight and father push her away.

J.F. agreed father was drinking on May 24. When asked, he told the DI, " 'YES! He was drunk. He always drinks. . . . When my dad drinks he is mean, he smells like alcohol, he can't talk right and his eyes are always red.' " J.F. said when father "comes over he is 'usually drunk.' " It made J.F. "sad to see his dad drunk and it also scare[d] him because he worries that he is going to hurt someone in his family." J.F. confirmed he had told the police he had witnessed at least 10 domestic violence incidents between parents. He explained the " 'fights usually start because my dad is drunk.' " Like A.G., J.F. also had seen father "slap, kick, and choke" mother.

J.F. reported that father had struck him approximately 30 times in the past, including once with a "charger cable" on his leg, causing him to bleed. J.F. said that the most recent time that father hit him was around two months prior. A.G. corroborated

J.F.'s statement.  A.G. also said father hit her in the past, including with a shoe, charging cable, and a belt, with the last incident occurring about one or two years prior.

Mother also said father was drunk on May 24—he " 'reeked' of alcohol."  She said father's drinking had "been a significant concern" for the past 10 years but usually he would come home and sleep.  Father's drinking had "greatly increased" in the past two to three years, however.  Mother was concerned that father was not taking his DUIs seriously.  She also told the DI that father was diabetic, and his drinking affected his health.  Mother said "father's physical aggression towards her ha[d] been happening for years."  He previously had kicked her in the back and she had called the police although it did not result in any criminal charges.  She said father also had punched, slapped, and grabbed her on other occasions.  Mother admitted the children had witnessed some domestic violence incidents, and A.G. had tried to intervene.  Mother was tired of father's drinking and wanted her family to feel safe.

Maternal aunt also confirmed the allegations about the May 24 incident.  Although she had seen father intoxicated, that was the first time she had seen him become violent while drunk.  Maternal aunt "stress[ed]" she did not always participate in family gatherings because she worked so much and did not know the extent of father's drinking.

Father denied the allegations.  He admitted he was drinking on May 24 but denied hitting or touching anyone.  He denied he was drunk.  He said he accidentally knocked the mug over; he did not throw it.  He said he told mother "there was no need to call the police and he tried to grab the phone from mother's hand."  He said the phone fell, he grabbed it, and it fell

7

again, causing it to break. He denied throwing the phone and breaking it or that he pulled mother's or maternal aunt's hair. He denied ever punching, grabbing, slapping, kicking, or pulling mother's hair in the past or physically harming her. When asked if he had hit the children in the past, father said he spanked them on the bottom when they were younger but " 'that was several years ago,' " and if the children claimed otherwise it was because they had been " 'coached by their mom.' " He also denied using any objects to discipline the children corporally or ever leaving marks or bruises on the children from spankings.

Father told the DI he only drinks alcohol once a month and at social gatherings "but never drinks to get drunk." As for his DUIs, father told the DI, " 'The one time I decided to drink in excess those days and it was my bad luck and I got pulled over.' " He acknowledged he drinks "but wanted to make it clear that he's not an 'alcoholic' and perhaps needs to pace himself when he drinks because he is not a big person."

At the August 14 adjudication hearing, when the court sustained the amended petition, the court noted the children's statements were consistent with mother's and maternal aunt's. The court found J.F. "quite credible," and father's representations "not credible." The court continued the disposition hearing to August 28.

By August 28, father had begun an 18-month DUI class and participated in five sessions of a parenting program. He was living with paternal grandmother. Father had had three 8-hour visits with J.F., monitored by maternal uncle. J.F. enjoyed and wanted to continue his visits with father. He confirmed father did not drink alcohol during the visits. The court detained J.F. from father and ordered J.F. remain released to mother. The

8

court ordered nine hours of monitored visitation a week for father, and gave DCFS discretion to liberalize his visits. Father's case plan included participation in a full drug/alcohol program with aftercare, random and on-demand drug/alcohol testing, a 52-week domestic violence program, and individual counseling to address case issues, including: "healthy relationships; insight/self-reflection re DV issues; child safety/parenting; impact of DV and substance abuse on kids & families."

## 2.     *Review period*

On February 6, 2025, DCFS reported father had been actively participating in his case plan. Father consistently visited J.F. on Saturdays and Sundays. The monitor said father was caring and loving, and J.F. said he enjoyed the visits. As of December 2024, father also was picking up J.F. at least once during the week for an hour or two. On January 27, 2025, DCFS liberalized father's visits to unmonitored due to his progress in his case plan and consistent visitation. DCFS noted mother, father's monitor, and J.F. "are in agreement with such liberalization." As of March 4, 2025, those visits were "going well." Mother had no concerns.

Father also had been testing negative for drugs/alcohol and was attending AA sessions. He was participating in a multiple offender, 18-month DUI program. Father "remain[ed] in denial regarding his alcohol use from [his] past," however. DCFS stated "father continues to think it was bad luck that he got the DUI's." Father's domestic violence coordinator told DCFS that father "is also in denial regarding the domestic violence relationship with the mother." He "admitted to having disagreements and discussions but never any violence."

9

DCFS assessed the risk to J.F. for future "abuse/neglect" as moderate due to father's "continued denial of allegations." DCFS noted father "continue[d] to minimize his alcohol use even after his third DUI." He also continued "to deny physical altercations during past domestic violence incidents." DCFS recommended the court continue services.

At the March 13, 2025 section 364 review hearing, Father's counsel asked the court to return J.F. to father's custody or, alternatively, to begin overnight visits. Minors' counsel noted that, although father had been participating in his programs, he still denied domestic violence, admitting only to arguing with mother. The court commended father for "the work that he's doing." The court believed, however, "there does need to be a little bit further insight before we change any of the previous court orders." The court continued the matter for another three months.

In its May 28, 2025 status review report, DCFS stated mother had completed a 16-week parenting program and a 26-week domestic violence support group. She said "she thought she would have to live in a domestic violence relationship all of her life to protect her children. However, she now . . . [had] a new sense of freedom due to not being controlled by . . . father."

Father was enrolled and participating in his court-ordered programs. Father's unmonitored visits with J.F. had been going well. He continued to test negative and made up tests he missed when he had to drive back from Bakersfield where he worked. Father was progressing in his alcohol awareness program and continued to attend AA group sessions. On May 19, 2025, the social worker spoke with father's domestic violence group facilitator. The facilitator said father "was initially in denial of

10

the domestic violence and kept quiet during many sessions." She spoke to father directly to improve his participation. The facilitator said "father is making slow progress and is now admitting to some of the emotional abuse but not yet the physical." In her progress report of the same date, the facilitator stated father "is more aware of [the] abusive/violent behavior and gradually accepting responsibility over own actions. [Father] is learning about socialization and core beliefs, communication skills improvement emphasizing listening, self-control[,] especially in upsetting situations, and assertiveness vs. aggressiveness." She recommended continued participation.

DCFS also reported a new incident. Mother had told the social worker father had some of her and A.G.'s things but wouldn't return them. The social worker spoke to father to try to arrange to pick the items up from him. According to mother, father then "showed up" at her workplace and "accused her of being petty" for reporting the situation to the social worker. Mother said father "used foul language toward her in a public setting at her place of employment." When the social worker asked father about it, he denied this behavior and only admitted to "purchasing food items from mother's employment." The report noted the social worker had encouraged father "numerous times to take his programs seriously and try to make changes," so the "cycle" would not repeat with his child. Father, however, continued "to deny any wrongdoing." Father now admitted he "did have a problem" with alcohol and was addressing it in his program, but denied "his drinking influenced his behavior at home."

DCFS considered father to be only in partial compliance with his case plan, however, because he had "not demonstrated

11

consistent changes in behavior as he continue[d] to deny any domestic violence." The report stated father said he didn't know "why any of the parties involved, including the children, made any negative comments as this never happened." He continued to deny the events of May 24, 2024, and said he "ha[d] never tried to control . . . mother and has not mistreated her in any way."

DCFS acknowledged father had "made substantial progress since the initial stages of this case," but stated "there is more room for growth." DCFS "expected" father would "be able to make the necessary changes in his life in order to be a better father and partner in the future." The report noted father "is able to verbalize that he had problems with his alcohol use but does not directly correlate that to the trauma with the mother and his child." Father had said he would continue to participate in his court-ordered programs and wanted to be "a better father" to J.F.

Because father was out of the home—and parents no longer wanted to be in a relationship—DCFS assessed J.F.'s risk for future abuse or neglect as low. DCFS recommended the court terminate its jurisdiction, award mother sole legal and physical custody of J.F., and grant father unmonitored visits.

On June 6, 2025, the court continued the matter and—at father's counsel's request—ordered DCFS to interview father about mother's new allegations. Instead of interviewing father about the alleged incident at mother's work, the social worker interviewed father on June 26 about the allegations in the sustained petition. Father again denied the petition's allegations. He denied having had any "physical altercation[s] or domestic violence incidents" with mother and was "unsure why everyone is lying." He denied "ever letting any argument become

a physical altercation with . . . mother." Father also denied any physical abuse toward the children, and stated that he would "never hit the children." He also denied having "an alcohol use problem." He denied that the children ever saw him intoxicated and didn't know why they and mother said he "drank a lot." With respect to his three DUIs, father still said that on the days he drank "he had the bad luck of getting caught."

The same day, the social worker also spoke to mother. She said there had been "no recent incidents" with father. J.F. had had one overnight visit with father and "appeared happy" to have spent that time with father and his family. She had no concerns with J.F. spending time with father.

The court held the continued review hearing on July 11, 2025. Father's counsel initially noted the social worker did not interview father about mother's recent allegations, as the court had ordered. Counsel asked the court to allow father to testify to show mother's allegations were "not . . . remotely accurate." The court said it would read the report "in the light most beneficial" to father.

Counsel argued that, although father had denied physical domestic violence, "it's not a legal requirement that a person admit something in order to get their child back." Counsel also noted father had been charged with battery and "would be potentially exposing himself to criminal liability if he admitted domestic violence to the social worker." Counsel stated father had been staying away from mother, except when he went to her workplace "in frustration, based on her mischaracterization of events, and that he did not use foul language, but he was upset at her. That's one incident in over a year." Counsel argued, "I don't think one time venting at a parent is enough to show that my

13

client . . . continues to be a batterer." Counsel noted father's progress letter from his therapist[5] stated they had been working on father's "emotional regulation" and "complex relational dynamics"—"key" areas "to improving his relationship with the mother so that . . . there's not that type of escalation of tension and behavior that the court was concerned about at the disposition hearing." In his domestic violence class, father also had admitted to emotional abuse of mother. Counsel argued it was "significant that someone would admit to emotional abuse. That's an important component of domestic violence. It shows my client taking accountability." Counsel argued the absence of any incidents of domestic violence since the case began showed father had "separated from mother emotionally, is not trying to be involved in her life anymore. He's not trying to control her in any way. He just wants to be in his son's life."

Counsel also noted father consistently tested negative for alcohol leading DCFS to allow father to have overnight visits with J.F. J.F. was happy to go to those visits. Counsel argued father had "ameliorated the situation enough . . . in regards to domestic violence and alcohol abuse." He asked the court to find DCFS had not proved J.F. would be at substantial risk if returned to father's custody.

J.F.'s counsel asked the court to close the case with custody to mother and a written schedule for unmonitored overnight

---

[5]     For the June 6 hearing, father had submitted a May 22, 2025 progress letter from his therapist confirming he had participated in 22 individual therapy sessions since September 2024. They had "addressed a wide range of issues related to the incident." The court admitted the letter into evidence for the July 11 hearing.

14

visits for father. Counsel "applaud[ed] . . . father for engaging in his services and getting to the point to have overnight unmonitored visitation with [J.F.]," but argued father lacked "insight"—he still had not "own[ed] up to anything," having claimed his past DUIs were "bad luck," and had not "admitt[ed] to anything" with respect to domestic violence. Counsel argued father's statements showed "he is not really gaining anything from the services. He is doing them, but I think the issue is whether or not return would be appropriate at this time. I think overnights are appropriate. They just started . . . about three weeks ago. They've been going well." Counsel argued closing the case "would be appropriate," as mother had completed her case plan, had been "forthcoming to DCFS," and had done everything DCFS had asked of her. Counsel continued, "And given the history of this relationship, I think sole legal custody would be appropriate."

Mother's counsel noted there had been no concerns with J.F.'s unmonitored visits with father or with the overnight visits that began more recently. Counsel said "mother's torn between wanting to be protective and just following what [DCFS] wants from her and also understanding that [J.F.] does have a good relationship with his father." Accordingly, mother submitted the issues of terminating jurisdiction and legal and physical custody to the court.

DCFS's counsel noted the court had been "very clear" in March that it "needed to see a level of insight into the case issues" before the court would return J.F. to father's care. Counsel argued, "There's a difference between the father having denied for legal reasons and what the father said." Counsel noted the last minute information report stated father "not only denies

the allegation, he calls the mother and the children liars. The issue at the initial assumption of jurisdiction was the intertwined issue of domestic violence and alcohol, the fact that the father was utilizing alcohol and engaging in domestic violence while under the influence of alcohol. However, when he was interviewed, the father denies ever having an issue with alcohol despite having three DUIs. . . . The father indicates that he doesn't understand why the children and the mother state he drank a lot, indicating he drank rarely, denies having a problem with alcohol, and denies having any issues as to why this court took jurisdiction." Counsel noted father had participated in 72 AA "courses," but had "gained absolutely no insight as to the alcohol issue." Counsel similarly noted that, despite having participated in 27 domestic violence classes, father denied any physical violence even though the court had sustained the a-1 count and ordered him to complete a 52-week program. Counsel continued, "So the father has not even completed his domestic violence program and has gained absolutely no insight into the case issues, which is what the court warned him about in March."

Counsel noted DCFS "understands the child is doing well during the unmonitored visits, which is why they recently liberalized the father's visits to overnight visits. But at this time, [DCFS] does not believe that it is safe to return [J.F.] to his father because the father has not gained any insight as to . . . why the petition was sustained and what the father needed to address." Father's counsel objected to DCFS's characterization of the evidence, noting DCFS's report stated father "told the social worker that he had a problem with alcohol, just that he had not connected it to issues in the home." Counsel also noted father had "acknowledged emotional abuse" in his domestic violence

16

program. Counsel thus argued "it's mischaracterization . . . to say my client has no insight whatsoever."

After hearing argument, the court explained,

"[T]he narrow question here is whether or not the conditions which would justify the initial assumption of jurisdiction . . . exists, and, in this situation, I don't believe that they do. [¶] I think that at this point, sort of despite limited insight from father, . . . I'm not 100 percent certain that this is a situation where father, with another few months, would gain any more insight, and we could be going on forever and ever and ever. And I think that at this point, minors can be safely maintained in the home of the mother, and it seems like, despite the fact that they're not going to reconcile, that . . . mother is not in a situation where she is trying to prevent any visitation or connection. So I think that overnights are going well, and I think that the parents are closer together than we might suspect with regard to the best interest of the minors."

The court then heard father's argument on the custody order. He objected to sole legal custody for mother. Counsel argued "it would seem cruel" that father—who was having overnight visits—"could be so involved in his son's life and not even have the right to take part in important decisions. And it's highly unfair to have sole legal just because he does not admit the allegations." Counsel further argued there had been no evidence since the case opened more than a year ago that father had tried to control mother or had been violent or abusive. Counsel argued father had been co-parenting with mother "with more than passing grades." Counsel continued, "It's unjustified to grant mother sole legal [custody] under these circumstances, and it would be a disservice to [J.F.] to keep his father out of his

17

life in that way." If the court were not inclined to make "an equal joint legal custody order," counsel alternatively asked for joint custody with mother to have tie-breaking authority. Mother then could "have the final say" if she were "worried about" father "trying to be controlling in some way."

After stating it had "take[n] into account" father's counsel's argument, the court said it still was granting sole physical and legal custody to mother based on father's "lack of insight." The court also allowed father to have unmonitored visits and overnights "at a rate of four times per month" that was "basically every weekend." The court stayed termination of jurisdiction pending receipt of the juvenile custody order. On July 18, 2025, the court entered the juvenile custody order giving mother sole physical and legal custody of J.F. and ordered father "shall have a minimum of nine hours unmonitored visits per week and four overnight visits per month." The court terminated its jurisdiction. Father appealed.

## DISCUSSION

Father contends the juvenile court failed to apply the best interests of the child standard in awarding sole legal custody to mother, and substantial evidence did not support a finding that an award of sole legal custody to mother was in J.F.'s best interests.[6]

---

[6] Father states his appeal is from the custody award granting mother sole legal and physical custody of J.F. Father makes no argument that the juvenile court erred in granting mother sole physical custody, however. He thus has forfeited the issue, and we do not consider it. (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 72.)

18

1.  ***Father's notice of appeal***

Father's notice of appeal—filed September 16, 2025—states he appeals "from the findings and orders of the court" made on "July 11, 2025 . . . regarding child custody." DCFS argues father's notice of appeal was untimely and appealed only the orders made at the July 11 hearing, not the juvenile custody order entered July 18. As father asserts, the orders announced July 11 were stayed, and the appealable final judgment—the juvenile custody order—was not entered until July 18, 2025. The custody order also was not effective until the court issued it on form JV-200. (§ 362.4, subd. (e) [requiring the Judicial Council to "adopt forms for any custody . . . order issued under" the statute]; Cal. Rules of Court, rule 5.700(b) [juvenile custody order entered on termination of jurisdiction "must be prepared" on form JV-200].)

We liberally construe father's notice of appeal as from the July 18, 2025 custody order, finding no prejudice to DCFS. (Cal. Rules of Court, rule 8.405(a)(3); see also *In re Joshua S.* (2007) 41 Cal.4th 261, 272 [notice of appeal is liberally construed if it is clear what appellant was trying to appeal from and respondent is not prejudiced].) Construing the notice of appeal from the July 18, 2025 order, its filing 60 days later on September 16, 2025, was timely. (Cal. Rules of Court, rule 8.406(a)(1).)

2.  ***Applicable law and standard of review***

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders. The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child." (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*), citing § 362.4, subd. (a); *In re Chantal S.* (1996) 13 Cal.4th 196, 203 (*Chantal*

19

*S.*).)  Exit orders "become part of the relevant family law file"—or may be used to open a file—"and remain in effect in the family law action 'until modified or terminated by subsequent order.' " (*In re T.S.* (2020) 52 Cal.App.5th 503, 513 & fn. 3 (*T.S.*); § 362.4, subds. (b), (c).)

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.' " (*T.S., supra,* 52 Cal.App.5th at p. 513; accord, *J.M., supra,* 89 Cal.App.5th at p. 112.)  "The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests." (*J.M.,* at p. 112, citing *Chantal S., supra,* 13 Cal.4th at p. 201.)  "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . .  Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' " (*J.M.,* at p. 112, quoting *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R.*) [no presumption of joint custody at termination of jurisdiction]; accord, *Chantal S.,* at p. 206.)

" 'Joint legal custody' means that both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (Fam. Code, § 3003.)  " 'Sole legal custody' means that one parent shall have [that] right and . . . responsibility . . . ." (*Id.,* § 3006.)

We review custody orders issued under section 362.4 for an abuse of discretion.  (*J.M., supra,* 89 Cal.App.5th at p. 113; see *In*

*re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4 [court has broad discretion to make custody orders when it terminates jurisdiction].) "We will not disturb the juvenile court's decision ' " 'unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*J.M.*, at p. 113; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 319 [" ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "].) "A court abuses its discretion in making a child custody order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child" or "if it applies improper criteria or makes incorrect legal assumptions." (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497, italics omitted; see also *In re C.B.* (2010) 190 Cal.App.4th 102, 123 ["When applying the deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence . . . .' "].)

3.  ***The court did not abuse its discretion by awarding sole legal custody to mother***

Father first argues the court did not distinguish between physical and legal custody and "treated insight . . . as the *sine qua non* standard" to determine custody "in lieu of the best interests of the child standard." We disagree. The juvenile court may not have used the phrase "in the best interest of the child," but it was not required to state its reasons for making the custody order. (*Jennifer R., supra*, 14 Cal.App.4th at p. 713; contra *In re N.M.* (2023) 88 Cal.App.5th 1090, 1095 (*N.M.*) [reversing order where there was no explicit finding that sole custody was in the child's best interest and the record reflected

21

that the court relied on improper considerations].)  We can infer the court implicitly found it would not be in J.F.'s best interests for father to make joint parenting decisions with mother due to the totality of the circumstances, including father's lack of insight into his behavior that led to J.F.'s removal, including his continued denial of his history of both alcohol abuse and his treatment of mother and the children.  Correspondingly, we can infer the court found it was in J.F.'s best interests for mother to have sole custody—both legal and physical.  (See *In re. J.S.* (2011) 196 Cal.App.4th 1069, 1078 ["Ordinarily . . . appellate courts will indulge all reasonable inferences favorable to the judgment" absent a requirement that the court make express findings].)

Father also argues the court "making [f]ather's failure to admit past physical violence dispositive of whether it was in J.F.'s best interest that [f]ather participate in decisions about J.F.'s medical care, education, and similar life decisions was error, based on pure conjecture."  Again, we disagree.  First, we can infer the court did not base its decision solely on the fact father did not admit he had engaged in physical violence.  Second, substantial evidence supports the court's implied finding that its sole custody award to mother was in J.F.'s best interests.

We acknowledge father had made progress in his alcohol abuse treatment program and there were no signs that he had been drinking since DCFS became involved.  Father asserts he admitted in May 2025 that he had a problem with alcohol that he was addressing in his program.  By the time of the section 364 hearing, he also had begun to make "slow" progress in his domestic violence program, admitting to some "emotional abuse" of mother.

22

However, father had yet to recognize—after more than a year—his aggression toward mother and J.F. constituted domestic violence, the connection between his violent conduct and his alcohol use, and the negative effect it all had on J.F. Even in admitting he had a problem with alcohol, for instance, father denied "that his drinking influenced his behavior at home." Rather, father's "admission" was to a past problem relating to his "multiple DUI's." Moreover, father repeatedly—even as late as June 2025—denied *all* of the petition's allegations, denied ever having a physical altercation with mother, denied the children ever saw him intoxicated, said everyone was lying, and chalked up his DUIs to bad luck. Yet J.F.—whom the court had found very credible—consistently stated he had seen domestic violence between father and mother many times—usually when father was drunk; and it made him both sad and scared to see father drunk because he worried father would hurt someone. J.F. even was able to describe what father was like when he was drunk: he was mean, smelled like alcohol, could not talk right, and his eyes were red. A.G. corroborated J.F.'s statements, and both children reported having seen father slap, kick, and choke mother in the past. Both children also corroborated each other's statements that father previously disciplined them by striking them with objects, resulting in injury at least for J.F.

The court reasonably could conclude that, given father's lack of insight into—or even acknowledgement of—his behavior, it would not be in J.F.'s best interest to require father and mother to communicate and coordinate regarding significant decisions related to J.F.'s health, education and welfare.[7] This conclusion

---

[7] Father asked us to take judicial notice of the Los Angeles Superior Court's on-line parenting vendor resource list in reply to

23

is additionally supported by the most recent incident between father and mother, where the evidence indicated that the parents had an unresolved conflict regarding some personal property, mother shared this conflict with DCFS, and father went to mother's place of employment to confront her. Although the court arguably could have awarded parents joint legal custody, and given mother tie-breaking authority in the event father disagreed, father hasn't demonstrated the court acted outside the bounds of reason by instead awarding mother sole legal custody. (See *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1195 ["We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court."].)

Father relies on *N.M.*, *supra*, 88 Cal.App.5th 1090. There, the trial court expressly granted the mother sole legal custody because it did not want " 'to reward' " the father, "who had refused to participate meaningfully in the case plan." (*Id.* at p. 1095.) The reviewing court concluded "[t]his was an abuse of discretion because an exit order must serve the best interests of the children, not reward or punish one parent or another for failing to comply with the case plan." (*Ibid.*) Here, there is no indication the juvenile court awarded mother sole legal custody to punish—or to not reward—father for his lack of insight, or that

---

DCFS's argument that joint legal custody could lead to "altercations and discord." Father argues "the list shows resources are available to facilitate parents engaging in shared parenting." DCFS did not file an opposition to father's request. We now take judicial notice of the existence of the resource list on the court's website. (Evid. Code, §§ 452, subds. (c), (d), 459, subd. (b).) We conclude the existence of those online tools did not require the court to grant joint legal custody here.

24

the court otherwise relied on any improper basis for rendering its decision.

Father also notes he had been making parenting decisions for J.F. "for the entirety of J.F.'s life," and mother did not oppose joint legal custody. But the court was required to focus on J.F.'s best interests based on the totality of his specific circumstances. (*J.M., supra*, 89 Cal.App.5th at p. 112; see also *M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 528 ["Once the juvenile court sustains the allegations of the dependency petition, the court has an independent obligation to determine the best interests of the child."]) It did that. Considering those circumstances, we cannot find the court acted arbitrarily in granting sole legal and physical custody to mother or that the evidence did not support its decision.

## DISPOSITION

We affirm the juvenile court's order.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

OCHOA, J.[*]

We concur:

ADAMS, Acting P. J.

HANASONO, J.

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.